



FILED

Aug 18 2025, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

April Neal,

*Appellant-Petitioner*

v.

Ryan Neal,

*Appellee-Respondent*

August 18, 2025

Court of Appeals Case No.
24A-DR-2968

Appeal from the Clinton Superior Court

The Honorable Matthew C. Kincaid, Special Judge

Trial Court Cause No.
12D01-1210-DR-999

**Opinion by Judge Bradford**

Judges May and Mathias concur.

**Bradford, Judge.**

## Case Summary

[1] April Neal ("Mother") and Ryan Neal ("Father") dissolved their marriage in 2013. The parties share two children, L.N., born on December 20, 2009, and H.N., born on August 22, 2012 ("the Children"). Although initially the parties shared joint legal custody of the Children with Mother having physical custody, in 2017 the trial court granted physical custody to Father. After Mother had experienced some mental-health issues, Mother and Father entered into an agreement which had provided that Mother's parenting time was to be supervised and that Mother was not to drive the Children to or from visits due to concerns about her ability to drive safely.

[2] Mother moved to modify her parenting time in December of 2023. After an evidentiary hearing, the trial court ordered that Mother's parenting time continue to be supervised and that Mother continue to not drive the Children. The trial court also ordered Mother to pay $1000.00 of Father's attorney's fees. On appeal, Mother contends that the trial court abused its discretion in denying her requests to have unsupervised parenting time and to be able to transport the Children. Mother also contends that the trial court abused its discretion in

ordering her to pay Father's attorney's fees. Because we disagree with each of Mother's contentions, we affirm.

## Facts and Procedural History

[3] Mother and Father dissolved their marriage on December 27, 2013. The parties share the Children, and, initially, the parties were awarded joint legal custody of them with Mother having physical custody. In September of 2015, the trial court entered an order appointing guardian ad litem ("GAL") Clare Deitchman. The trial court ordered GAL Deitchman to "investigate and make a recommendation as to custody and parenting time" and to file a report with the trial court. Appellant's App. Vol. III p. 12. In February of 2017, the trial court granted physical custody of the Children to Father.

[4] Mother and Father have entered into numerous agreements regarding supervision and parenting time throughout this case. On February 14, 2022, the parties entered into their fourth agreement regarding supervised visitation, which agreement the trial court approved. The agreement provided that the Children's "parenting time with Mother […] shall be supervised at all times[,]" and that "[t]ransportation will be provided at the beginning of the visits by [Maternal Grandmother, Pauline Reed] and at the end of the visits by Father." Appellant's App. Vol. III p. 88.

[5] Mother moved to modify her parenting time on December 8, 2023, in which motion she alleged that "there have been substantial and ongoing changes in the parties' circumstances such that a modification of Mother's parenting time

is warranted pursuant to Ind[iana] Code 31-17-4-2." Appellant's App. Vol. III p. 37. Mother requested that "the supervision requirement be removed as the [C]hildren would not be physically or emotionally harmed if Mother's parenting time would be unsupervised[,]" and that "the driving restrictions be removed and that she be able to transport the children." Appellant's App. Vol. III p. 38.

[6] In August of 2024, GAL Deitchman filed her supplemental report ("the GAL report"). The GAL report made mention of Mother's recent driving evaluations and provided that GAL Deitchman had "asked [the Children] about driving in a vehicle operated by [Mother]. [L.N.] on three (3) separate occasions has informed the GAL that she 'absolutely' does not want to be driven by [Mother]." Appellant's App. Vol. III p. 45. The GAL report specified that H.N. had expressed a desire for the parenting time supervision to continue and for the driving restrictions to remain unchanged. The GAL report also noted that the Children had gone "long periods of time" where they had not seen Mother due to her mental and physical health issues. Appellant's App. Vol. III p. 41.

[7] The GAL report detailed information from medical records, which Mother had provided to GAL Deitchman, including psychiatric records. Included in the records were visit notes from October 31, 2023, which provided that Mother reported "she 'needs a letter to give to an attorney explaining that her bipolar is stable and revoke her ability to not drive the car with her kids in them.'" Appellant's App. Vol. III p. 44. A letter from a provider indicated "[Mother]'s

bipolar diagnosis is not currently affecting her ability to drive, specifically without her children. [Mother] has gained the ability to have supervised visits with her children, so allowing her to have her children in the car would be a great step to allow her to gain more independence[.]" Appellant's App. Vol. III p. 44.

[8] The GAL report also provided that the records indicated that the visit prior, on October 16, 2023, noted that

> Mother "has started dating a gentleman that wakes up around 2:30 am and [Mother] would find herself being wired and waking up early to text him in the morning. . . . they have since broke up, so her sleep schedule is back to normal. . . . feared that she was going manic.

Appellant's App. Vol. III p. 44. GAL Deitchman recommended in the report, in part, that Mother's parenting time continue to be supervised and that Mother not be allowed to drive the Children.

[9] An evidentiary hearing was conducted on October 22, 2024. At the hearing, Mother testified that, while she and Father were still married, she had had a tumor on her left optic nerve which had required surgery. Later, Mother was diagnosed with bipolar disorder and has experienced physical health issues, including vision problems. Mother testified that while she can see out of her left eye, she "can't move it to the left, from midpoint to the left[,]" and that when she checks for traffic to the left, she "will close [her] eye and [she] can see perfectly with [her] right eye with no incident." Tr. Vol. II p. 25.

[10] Reed testified that she had been Mother's visitation supervisor for "years" and that she believed that "at one point [… Mother] needed supervision." Tr. Vol. II p. 54. Reed further testified that

> after [Mother's] brain surgery she became manic and bipolar. [….] She didn't have good judgment, stuff like that, because they did not have her medications right. So, it took her going into a mental institution, them messing with her medicines, changing them around. She–she has been into a mental institution. She goes in, they keep her for two to three weeks and say well she is ready to go home. And I tell them no she is not ready to go home.

Tr. Vol. II p. 54.

[11] Reed testified that she believed that Mother had not been hospitalized within the last two years of the hearing. Reed testified that the last time Mother had been hospitalized was for a "Lithium overdose" as a result of her medication, and that, by the time Reed was able to reach someone for assistance on the matter, Mother "had already went into the–the bipolar or the mania[.]" Tr. Vol. II p. 53. Reed testified that she had not seen Mother struggle with the same kind of condition since 2022, that Mother has maintained consistency with her medication, and that Mother "goes to every doctor's appointment." Tr. Vol. II p. 54.

[12] Father also testified at the evidentiary hearing. Father testified that in May of 2018, Mother had had a mental-health incident while driving, which had ultimately resulted in Mother's hospitalization. Father testified that since then,

Mother's improvement had been "up and down for quite a while" until "recently." Tr. Vol. II p. 67. Father testified that in 2022, Mother was "having issues with her medicine and not being correct in her being manic so to speak." Tr. Vol. II p. 68. Father testified that this was related to the "level of Lithium that […] she was being prescribed." Tr. Vol. II p. 68. Father also testified that Mother had been, "[a]t this point[,]" stable, "[m]aybe for the last year." Tr. Vol. II p. 77. Father testified that he had a concern from the spring of 2024 regarding an instance in which Mother "was trying to take a lamp apart or change a lightbulb in the middle of the night while the kids were trying to sleep." Tr. Vol. II p. 78.

[13]  Mother testified at the evidentiary hearing that, since 2022, she has seen her doctors "every three months like clockwork and [her] medication is regulated as it needs to be by [her] doctors and [she] take[s her] medicine every single day." Tr. Vol. II p. 14. Mother testified, "I am very, very serious about missing my medication and things like that." Tr. Vol. II p. 14. Mother testified that there had not been any issues with her medication in the last two years since the evidentiary hearing, and she testified that she is compliant with all of her doctors' requests. Mother also testified that she currently had a non-restricted driver's license as a result of her driving tests done through specialized services. Mother testified that she had been, since April of 2024, and still was at the time of the hearing, working as a driver for Uber. Mother admitted into evidence her Occupational Therapy Driving Evaluation conducted by Senior Driving Mobility Services from January 6, 2023, and testified that she had passed that

exam, "went to the BMV[,]" and passed the driving test there, as well. Tr. Vol. II p. 24. Mother also testified that she "revealed [her] medical history" including her bipolar diagnoses and the extent of some of her physical limitations to the Senior Driving Mobility Services instructor. Tr. Vol. II p. 24.

[14] Mother also admitted into evidence a follow-up Occupational Therapy Driving Evaluation conducted on August 6, 2024. That report provided that Mother had "performed very well during the on road portion of the evaluation and this therapist sees no reason (from a driving standpoint) to keep [Mother] from transporting her children." Ex. Vol. p. 23. The report also provided, "Based on today's driving evaluation and the information provided, this therapist is making the following recommendation: This client is fit to continue unrestricted driving." Ex. Vol. p. 24.

[15] The trial court entered its order on the evidentiary hearing on November 21, 2024. The order provided, in part, that "Mother's parenting time with the [Children] shall continue to be supervised." Appellant's App. Vol. III p. 34. The order also provided that Mother "shall continue to not transport the [Children] in a motor vehicle." Appellant's App. Vol. III p. 34. Finally, the trial court ordered Mother to "pay $1,000.00 of Father's attorney fees within ninety (90) days." Appellant's App. Vol. III p. 34.

## Discussion and Decision

[16] Mother contends that the trial court abused its discretion in denying her petition to modify her parenting time. We initially note that the Indiana Supreme Court

has recognized "a well-established preference in Indiana for granting latitude and deference to our trial judges in family law matters." *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016) (internal quotation omitted). The Indiana Supreme Court has further explained that

> [a]ppellate deference to the determinations of our trial court judges, especially in domestic relations matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an extended period of time. Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children.

*Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011).

[17] We note that the trial court did not enter specific findings of fact and conclusions thereon. Therefore, a general-judgment standard applies. *Matter of Paternity of A.R.S.*, 198 N.E.3d 423, 430 (Ind. Ct. App. 2022). "Under this standard, we will reverse the award of custody only if the trial court's determination is clearly against the logic and effect of the facts and circumstances before the court or the reasonable inferences to be drawn therefrom." *Id.* Moreover, we will not reweigh the evidence or judge the credibility of witnesses. *In re Paternity of C.S.*, 964 N.E.2d 879, 883 (Ind. Ct. App. 2012), *trans. denied*.

[18] "Indiana has long recognized that the rights of parents to visit their children is a precious privilege that should be enjoyed by noncustodial parents." *Duncan v.*

*Duncan*, 843 N.E.2d 966, 969 (Ind. Ct. App. 2006), *trans. denied*. Indiana Code section 31-17-4-2 provides that the trial court "may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child." The trial court, however, "shall not restrict a parent's parenting time rights unless [it] finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional development." *Id*. Although the statute uses the term "might," this court has held that a parent's visitation rights may not be restricted "unless that visitation *would* endanger the child's physical health or emotional development." *Duncan*, 843 N.E.2d at 969 (emphasis in original).

## I.    Mother's Supervised Parenting Time

[19]    Mother contends that the trial court was required to explicitly find that unsupervised parenting time would endanger the Children's physical health or impair their emotional development and further contends that the evidence presented was insufficient to permit such a finding. We conclude that ample evidence was presented that would support the conclusion that unsupervised parenting time would significantly impair the Children's physical health or emotional development.

[20]    Father testified that L.N. had been "concerned that [Mother] was going manic again because she was up late doing things at night when the kids would be sleeping[.]" Tr. Vol. II p. 85. Consistent with this concern, Mother admitted that she had told her psychiatrist that she was "feeling manic" approximately five months prior to the hearing, and that she had been staying up late during

that period. Tr. Vol. II p. 38. Mother also admitted to having skipped doses of her medication "every other day" prior to 2022, which had led to the requirement of supervised visitation with the Children, and which she admitted had likely been the reason for which she had been deemed "a danger to the [C]hildren." Tr. Vol. II p. 14.

[21] The GAL report detailed that Mother had indicated that "she was concerned about going 'manic' due to poor sleep habits[,]" and that "Mother is not a good self-reporter historically as to her medical conditions[.]" Appellant's App. Vol. III p. 48. The report further noted that the Children both indicated that they were "uncomfortable with unsupervised time" with Mother. Appellant's App. Vol. III p. 42. The GAL report questioned whether the Children would be expected to "sound the alarm" or "make evaluations as to how [Mother] was behaving" if an instance arose in which Mother needed mental-health treatment during an unsupervised visit. Appellant's App. Vol. III p. 48. This is sufficient evidence from which one could conclude, at the very least, that the Children's emotional development could be impaired by experiencing one of Mother's "manic" episodes, something with which they are unlikely to be able to cope.

[22] As for the lack of an explicit finding on this point, Indiana Appellate Rule 66(A) provides the following:

> No error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties.

[23] In light of the ample evidence supporting a conclusion that unsupervised parenting time would significantly impair the Children's physical health or emotional development, we are left with no doubt that a remand would lead to nothing more than the addition of a finding quoting the statute. We decline to remand for that purpose.

## II.    Mother's ability to transport the Children

[24] Mother next contends that the trial court erred in denying her request to modify her ability to transport the Children in her vehicle during parenting time. In February of 2022, Mother and Father agreed that Reed would transport the Children to Mother's parenting time and that Father would collect them at the conclusion of visitation. Mother requested in her petition that the driving restrictions "be removed and that she be able to transport the children." Appellant's App. Vol. III p. 38.

[25] A thorough review of Mother's physical limitations and the concerns expressed by GAL Deitchman, Father, and the Children demonstrates that the trial court's ruling was well-grounded in fact and law. Father testified at the evidentiary hearing to a concerning incident in May of 2018, during which Mother had been "having an episode" while driving, and while on the phone with Father. Tr. Vol. II p. 67. Father testified that he had been on the telephone talking to Mother for thirty-five to forty minutes and he had been telling Mother, "hey, just pull over, I will get an ambulance to you, take you to the hospital, you know, you are having an episode, you need to stop, you are a danger to other people on the road." Tr. Vol. II p. 67. Mother was hospitalized

after this incident. When questioned about why her driver's license had previously been suspended, Mother testified, "I wasn't taking my medication and I wasn't safe behind the wheel." Tr. Vol. II p. 12.

[26] Following her surgery, Mother has experienced a number of physical limitations, including impaired vision in her left eye, which prevents her from looking left with that eye while driving, issues with double vision, and "drop foot[.]"[1] Tr. Vol. II p. 25. The GAL report included information on Mother's medical records, explaining that from 2017 to 2023, "[m]any of [Mother's] reports focused on 'gait difficulties', 'shaking' or 'spasms' in her arms, 'memory issues', 'right foot drop', 'manic' episodes requiring hospitalization at a state hospital in Evansville; note that she had failed a driving safety test; and lithium toxicity (2022) requiring inpatient hospitalization[.]" Appellant's App. Vol. III p. 43.

[27] The GAL report indicated that GAL Deitchman had "asked [the Children] about driving in a vehicle operated by [Mother]. [L.N.] on three (3) separate occasions has informed the GAL that she 'absolutely' does not want to be driven by [Mother]." Appellant's App. Vol. III p. 45. L.N. had elaborated, citing concerns about Mother's muscle weakness in her legs, slow response time, and hearing and visual impairments. H.N. had likewise been "adamant

---

[1] At the evidentiary hearing, Mother indicated that "drop foot" in her case affects her ability to walk, explaining that "[w]hen I am walking, sometimes I am unable to get my foot up as high and I will trip." Tr. Vol. II p. 25.

about not wanting to ride in a vehicle driven by Mother." Appellant's App. Vol. III p. 46. While GAL Deitchman discussed Mother's recent driving tests, which she had passed, GAL Deitchman ultimately reported that she "supports [L.N.] and [H.N.]'s position that they are not comfortable riding with their Mother driving due to her health conditions." Appellant's App. Vol. III p. 48. GAL Deitchman recommended that "Mother should not be allowed to transport the [C]hildren in a motor vehicle operated by her[.]" Appellant's App. Vol. III p. 49.

[28] The trial court considered all relevant evidence, including Mother's testimony and driving tests, Father's testimony, Reed's testimony, and the GAL report, and ultimately denied Mother's request to remove her driving restrictions. Based on the record, we conclude that the trial court acted within its discretion in denying Mother's request to modify her ability to transport the Children. Mother's argument is nothing more than a request to reweigh the evidence, which we will not do. *See In re Paternity of C.S.*, 964 N.E.2d at 883.

## III. Attorney's Fees

[29] Finally, Mother contends that the trial court erred in ordering her to pay $1000.00 of Father's attorney's fees. In an action to enforce or modify an order granting or denying parenting time rights, a trial court "may award: (1) reasonable attorney's fees; (2) court costs; and (3) other reasonable expenses of litigation." Ind. Code § 31-17-4-3(a). In determining whether to award such expenses, the trial court may consider "whether the petitioner substantially prevailed and whether the court found that the respondent knowingly or

intentionally violated an order granting or denying rights; and […] whether the respondent substantially prevailed and the court found that the action was frivolous or vexatious." Ind. Code § 31-17-4-3(b). In post-dissolution proceedings, the trial court may order a party to pay a reasonable amount toward an opposing party's attorney fees. *Ratliff v. Ratliff*, 804 N.E.2d 237, 248 (Ind. Ct. App. 2004). "The trial court has broad discretion in awarding attorney fees." *Gilbert v. Gilbert*, 777 N.E.2d 785, 795 (Ind. Ct. App. 2002). "We will reverse the trial court's decision only when it is against the logic and effect of the facts and circumstances before the court." *Id.*

[30] Father had requested that Mother pay $2000.00 of his legal fees related to the petition at issue, and the trial court ultimately ordered Mother to pay $1000.00. Mother testified that she earns approximately $500.00 per week as an Uber driver and that she is "saving a lot of money by living with" Reed, and Mother presented evidence that she had been given a $200.00 performance bonus as an Uber driver. Tr. Vol. II p. 31.

[31] Given the evidence of Mother's ability to pay and our conclusions that the trial court acted within its discretion in denying Mother's petition to modify visitation, we cannot conclude that the trial court's decision was against the logic and effect of the facts and circumstances before the trial court.

[32] The judgment of the trial court is affirmed.

May, J., and Mathias, J., concur.

ATTORNEY FOR APPELLANT

Denise F. Hayden
Lacy Law Office, LLC
Indianapolis, Indiana


ATTORNEY FOR APPELLEE

Brian K. Zoeller
Cohen & Malad LLP
Indianapolis, Indiana